All rise. The State of the Union Retrocommissioned Division of the Federal Court is now in session. Honorable Justice Wendy Horwich is presiding. Thank you. Please be seated. Will the clerk please call the next case. Case number 16, Plaintiff's Appellant, Richard Van Wazer, Plaintiff's Errata Expositions. Counsel, you may proceed. Good morning, Your Honors and Counsel. May it please the Court, my name is Bill Wormuth. On behalf of Richard Van Wazer, the Plaintiff's Appellant employee, Mr. Van Wazer was employed by Errata Expositions in September 19, 2013. Errata Expositions is a business involved in setting up trade routes. In this case, it was at a performing place. Mr. Van Wazer had worked for Errata Expositions prior to the September 19, 2013, date of accident. And he'd come back to work and worked for Errata for a full day. And then on September 19, 2013, while he was working that morning, he was moving a very heavy roll of carpeting, somewhere in the range of 300 pounds. When he made a misstep, he felt a pain shoot down his leg and continued working. And then at the early morning break at 9.30, he went and reported that injury to his supervisor. Well, nobody's contesting the accident or notice, are they? No, it's correct. However, I was trying to establish that Mr. Van Wazer, from the moment the accident happened all the way through the present, maintains that he injured his back on that date, doing that activity for that employer. I think that's clear from the record. That's the claimant's position. Thank you. So when he goes to Concentro, the employer-chosen medical facility, he freely admits, you know, I've had back issues throughout my history, from childhood. I've had visits with chiropractors, and even recently, infrequently, but I have visited chiropractors. But I've never had pain like the pain I experienced on September 19, 2013. So that was never hidden or was never secret. He went and continued treating with various doctors at Concentro. And on September 12th... Who was Dr. Paloian? Dr. Paloian was the initial doctor at Concentro. And he, from my understanding, administered the toxicology screen as well as did a prelim examination. In that examination, Paloian noted tests involving claimant's lumbar spine were negative and normal, correct? Correct. Okay. However, it's not until a week and a couple days after they start focusing on Mr. Van Wazer's back, and he returns to Concentro on September 20th, the day after the accident, and they start, they look at x-rays of his spine, which were negative, which is a standard for soft tissue-type injuries. But it wasn't until a week or so after the date of the accident that they really start focusing on the pain in Mr. Van Wazer's back. Based on delays with the insurance company, what have you, it's not until December that they decide to get an MRI, and almost four months after the date of the accident, which was ordered by Dr. Moser of Concentro, so we're still at the employer's chosen medical facility, and Dr. Moser, after reviewing the MRI results, said, hey, I can give you an epidural steroid injection, and if that doesn't work, then maybe you're going to have to go see a specialist. Counsel, ultimately the commission found persuasive Dr. Su's opinion regarding causation, right? Ultimately correct. So is Dr. Su's opinion regarding causation incompetent? Well, I have a comment on Dr. Su's opinion. This is from an admissibility standpoint. Is it incompetent as opposed to your opinion as to how much weight the commission should have given? It's not incompetent. So the commission determined it would give weight to Dr. Su's opinion and did not find convincing Dr. Salady's opinion. How is this not a situation typical to these types of cases where you're asking for this court to re-weigh conflicting expert opinions? Okay, Your Honor, Dr. Su does not examine Mr. Van Wazer until April of the following year, so it's more than seven months since the day of the accident. Dr. Su says this is just a lumbar strain, but I would recommend one month of work harding for five days, and it's related to the work injury. And it doesn't jive with what a lumbar strain should be. And furthermore, Mr. Van Wazer wasn't at maximum medical improvement seven months after the date of accident for a simple lumbar strain. So while maybe not incompetent, I don't think Dr. Su's opinion. Let me ask you this. I think you legitimately point to why you believe there were some factors that undermined Su's testimony. But let's look at Salahi that you're obviously going to be hanging your head at. Okay, we're going to talk about flaws. Dr. Salahi testified his opinions were based, as you know, partly on the history provided by claimant. However, he also admitted when he questioned the claimant about prior lumbar issues, the claimant denied any prior history of low back pain or leg pain. So the argument of the other side is going to be you're talking about Su. Clearly, Salahi's opinion was based upon an inaccurate history. And as you just said, the claimant with Kedlie, in arbitration, admitted he had prior low back issues and treatment for it. So how do we rate Salahi's opinions when it's based on a history that says he never had any preexisting problems? Okay, let's look at the history. It's all become so important about Mr. Van Wazer's prior back injuries. Yet Dr. Su doesn't even comment on that. He was fully aware of his injuries. But you're not answering my question. If the doctor bases an opinion on an inaccurate medical history, isn't that an issue? Well, it goes – I don't agree with Dr. Salahi's opinion of not – or I'm sorry, his position of not knowing Mr. Van Wazer's history. Well, he's the doctor for your client. He says that he told me he didn't have any – he denied a prior history of any low back or leg pain. That's what your doctor says. But he doesn't change his opinion. He said, oh, you can bring me the records, but I'm not going to change my opinion. And if the records, the previous chiropractic records are so important, then I don't know why the respondent didn't produce them. Because Dr. Su – Who's got the burden in this case, the respondent or the claimant? I understand the claimant has the burden, but he testified that he didn't have that type of back pain prior to the date of accident. Yeah, but if the claimant impeaches your own doctor, why would the respondent need to do anything? Right? He was working full duty up until the incident. How can he work full duty if this was some type of a pre-existing issue? And maybe your argument should be with Salahi, then. Wait a minute. That's not what the commission held. The commission didn't say it was the result of some pre-existing issue. The commission said he failed to prove that his current condition was causally related. That's entirely different. That's a different thing. And Su gave them the way to do it. He turned around and said the mechanism of injury doesn't correlate with the injury that suffered. It was merely a strain. So it was a failure of proof. It wasn't a finding by the commission that it was actually caused by some other event. Dr. Su also reviewed Dr. Salahi's records before he issued his addendum report. But he didn't make any mention of prior back issues or confronting. Salahi didn't know about prior back issues. So it wouldn't have been in his records. Your guy never told him. No. In February, when he initially saw Dr. Salahi, Dr. Salahi wrote, oh, no previous back history. And Dr. Su didn't comment on that. So it's really become an issue ever since Dr. Salahi's evidence deposition months later when the council is like, ah-ha, you mentioned you didn't have a previous back injury, previous back complaints in chiropractic visits. Well, Dr. Salahi said, well, I would have to see those records, but I'm not going to change my opinion based on the history given to me in the accident. So it is a doctor versus doctor conversation argument. However, Dr. Su's opinion is based on flawed understanding as well. So where does that leave us? Salahi's opinion is flawed because it's based on an inaccurate history, totally contradicted by the claimant himself when he says he had a history of lower back pain and problems. Then you've got, admittedly, some problems with Su's. So isn't it up to the commission to determine the weight and the efficacy of the evidence? How do you possibly reach the threshold of an opposite conclusion is clearly apparent. Well, when we look at a manifest weight, all of the doctors, until we get to Salahi and Dr. Su, are commenting on back issues from the accident. And then Dr. Versieri comments on issues with the MRI that Dr. Su doesn't comment on. So there's a group of doctors that say there's MRI evidence of back issues that could be causing the radiated leg pain. Dr. Su said, I haven't seen that. So when we're waiting to have evidence, there's a group of many more doctors saying that. Well, do we count the doctors and whoever's got the most doctors wins? No, but I mean, there was more Dr. Su saw Mr. Van Wazer one time compared to months and months of treaters and physical therapists working with Mr. Van Wazer. And then the point remains, he's working full duty, having a 300-pound roll of carbonate, and then he cannot work anymore after that. And conveniently, seven months later, a doctor says, oh, well, I don't believe that caused the incident, but he needs a month's worth of work harding at five days a week. It doesn't jive. The party stipulated an average weekly wage, right? Correct. How did the commission come up with the TPD figure that they came up with? I have no clue. I don't know. It's 66 and two-thirds, Section 8B of the Act. It's axiomatic as far as I'm concerned. And I don't know how they came up with that figure. We raised it at each level, and it still keeps going down to $887 change, and I have no idea how that happened. You raised other issues in your brief. You raised the TTD issue. You raised the penalties and fees issue, but you don't cite a single case in support of either or any of the arguments under 341. It would appear as if those issues are waived. Well, regarding the penalties, I raised the statute and the rules of the commission, and those commissions say there is a written explanation why the respondents denied TTD, and there was no written explanation for months and months and months until they decided to start paying TTD in January of 2014. But that doesn't mean he is entitled to TTD. You got any cases that say he's entitled to TTD if they don't come up with a written response? Well, it's – They're supposed to do. They're supposed to do. And what happens if they don't? Well, that's where the penalties kick in. Why would the penalties kick in? Well, TTD was due. If TTD was not due in LA, then no penalties would be warranted. However, they decided that TTD was due in January of 2014, so they started paying it. Don't you have any cases that say that? I mean, you're supposed to cite authority for this stuff. We're not supposed to be doing your research for you. I understand that. I cite the statute. Well, I mean, everybody cites the statute. The question is, how does the statute interpret it? And what is the sanction for noncompliance with the statute? Does it mean if they don't give a reason for not paying TTD and you turn around and say, well, the statute says you have to, I'm entitled to penalties, what happens if the commission finds no causation? You can still award penalties? No, I mean, it's all derivative. Right. So they can't, they're not going to award penalties if there's no. Well, the point is you better start citing some cases. There's nothing in these things. We're the ones that have to do the research for you, and we don't do it. I apologize. I was under the impression the statute was. 341 says cite this authority or issue waived. All right. We've fired a lot of questions. And you tell us succinctly why the decision is against the man of this weight and why the commission should not exalt Hugh or Dr. Sue over Saleki. What's your bottom line position? Because you know what the law states. The bottom line position is we have a worker who is doing something that is not out of the realm of probability, lifting a 300-pound roll of carpeting, doing it on a daily basis because that's his job. He puts up with back pain. He puts up with the nicks and scratches that most construction and trade workers deal with. He was doing it full day to day before. The next morning he comes and does it, and he can't do it any longer. Ever since that point, he's not been able to return to work. Dr. Salehi, based on his understanding of the history, which was not in dispute, said this mechanism caused his injury. Dr. Sue the Hutter, gone from the other side, said I don't believe it. But I do believe he does have issues with preexisting spondylosis or osteoarthritis, and he does have a lumbar strain. So there is an accident that no one is disputing. To the nature and extent of the accident, I believe Dr. Salehi hit the nail on the head, and I disagree with Dr. Sue. Counsel, you'll have time to reply. Thank you. May it please the Court, Counsel. Mark the triangle for the respondent at the lead. To build on what has just been discussed. To build on the Court's questions? Well, sort of, yes, Your Honor. Be candid? I'm sorry? Go ahead. Missed that. This is a case where we have competing medical opinions, but there's more. So that on one level, the Commission chose Dr. Sue or Dr. Salehi, but the what's more is why they did so. Dr. Salehi, of necessity, had to qualify his opinion, saying, well, if I saw those chiropractic records, and I think this is very important, it depends on what the history was, what his complaints were of those records. Did he have leg pain or didn't he? There's that fact, if you will, Dr. Salehi's response. In fact, that response was on redirect exam, as I recall, page 216 of the record. But there's also the history given to Dr. Palloy, I believe, or Dr. Mercier, I'll have to back up on that, that he had just seen the chiropractor just before this incident. And then we also had Dr. Sue saying the mechanism of this injury wasn't one to cause his current condition of well-being. It could cause a back strain. The two doctors we saw first, Palloy and Landos, were basically diagnosing just that. It is a consolidated corrective. He says that once the MRI was done by Dr. Mercier, that we could see this man's back, his degenerative changes in his lumbar spine. Well, your opponent, though, is going to say you can't ignore the claimant's testimony. He was consistent in his testimony. Is that true? Well, his testimony per se may not have been so, but that does not mean that that establishes the cause and effect relationship ipso facto. I would say no. Irrespective of when Dr. Sue saw the man or when Dr. Mercier saw the man, for that matter of fact, the commission has to look at the entire record. He had a preexisting condition. The question is, did he aggravate the preexisting condition, causing the need for a surgery, or did he not? Dr. Sue said no. The lumbar spondylosis of the preexisting condition did not cause the need for this. I mean, his testimony was pretty clear on that. He has a lumbar sprain strain, and that's it. The fact that it lingered on a bit and he would need some work hardening probably was just reflective of the fact that the man hadn't worked for a while. Be that as it may, I think that the gist of the thing is that Dr. Salehi testified that he would have to see these records. What was or wasn't in the records, we don't know. It's a bit of a dog that doesn't bark in the night sort of situation. We don't know what's in those records. So considering what Dr. Sue had to say and the fact that Dr. Salehi was hedging to some degree, the commission was well within its province to accept the medical opinion of Dr. Sue. The man had a preexisting condition. He told the doctors that he had just been to the chiropractor. Dr. Resier, I don't believe, I'm not sure. Counsel, I'm sure you'll correct me if I'm wrong. I'm not sure that Dr. Resier stated a causal connection opinion. So when Dr. Salehi testified, he was saying, yes, I think there's a connection. I do not believe that the doctor said that if I looked at the records, that would not change my opinion. No, that he did not say. He said I'd have to see these records to see if they support the idea that he had these symptoms before or whether he didn't. I think the inference there was that if he didn't, he has them now. Therefore, the other records, if they did not show leg pain, then that would support my theory. He didn't say it wouldn't matter. Far from it. So that in the end, what we are left with is conflicting medical evidence. I think Dr. Sue's opinions are consistent with the facts, irrespective of the fact that the petitioner testified consistently. The fact is there's a preexisting condition that he said was not caused or certainly not aggravated by the mechanism of the syndrome. It was not something that would cause structural damage. Dr. Salehi had an opposite opinion. But again, he qualified his statements by saying he would like to see what these have to say. I think the commission was within its right stance. If they did, in fact, infer, the decision doesn't tell us this, but if they did, in fact, infer something negative from the fact that these counterparty records were not produced, so, again, I think the finder of fact is permitted to ask itself. I presume the people who sit in the jury boxes or in the jury rooms across America ask themselves, why didn't they put that? Where is that evidence? What about what he did the day before? These are things that finders of fact always ask, and it's a legitimate question to ask the fact that the respondent could have put those records into evidence. I don't, again, that's not our, that was not the respondent's word. And I'm not certain we even knew the names of the chiropractors. He did testify, the petitioner did, to having recently seen several chiropractors. He named them, but I think that was at trial. So, on the whole, the manifest way of the evidence supports the finding from the commission that a petitioner failed to prove a causal connection between this incident in September 2013 and the need for the server. Thank you. Thank you, counsel. Counsel, counsel. Excuse me. Counsel, I have a question for you. Oh, I'm so sorry, Your Honor. Do you agree that the commission erred in its calculation of TPD? Oh, I, you know, I, this is someplace where the counsel and I will have to agree. I don't know, I don't know where that came from. So you do agree? Do you agree? Well, I agree that he, I mean, on the big picture that TPD was denied except for one-seventh of a week. You heard my questions. Counsel, do you agree that the commission erred in its calculation? In awarding only one-seventh of a week? No, in the amount. The amount. It's a simple question. $800 versus $1,200. Oh. It's no change. I, I. Do you know how to multiply two-thirds of an average weekly wage once it's been stipulated to? I, I, I can see if there is an error there, there is an error. I agree, Your Honor, that there may have been. So you don't want to tell us, you don't want to tell us whether you agree or not. Oh, if. What was it stipulated the man's average weekly wage was? If you permit me. Go ahead. I'm sorry. I, I. Jesus. I didn't mean to. I just did not. I, I, I apologize. There was a stipulated weekly wage of, boy, this is terrible. Anyway, this, I'm looking at the arbitration decision. The average weekly wage was $1,894. So that would, one-seventh of a week would be one-seventh of a week. No, what's two-thirds of $1,894? It's $1,261. And what did they compute his average weekly wage at? The commission. Well, the commission just affirmed on that. It's the same page, A8 of the appendix. It's just down lower. Yeah, that's, that's just, no. You, you would have to divide the $1,260. So in other words, I, I hate to try and pin you down to answering the question yes or no. Let's get real simple, Mr. Matranda. Average weekly wage is stipulated at $1,800-and-some-odd dollars. Two-thirds of that is $1,200-and-some-odd dollars. So it should, is one-seventh should have been calculated on one-seventh. That would be a yes? Absolutely. Okay. Thank you, Mr. Matranda. Thank you, counsel. Thank you, counsel. Counsel, you may reply. Well, thank you both, counsel. For the arguments in this matter, it would be taken under advisement that this position shall issue.